**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:90-cr-00113** |
| | ) | **The Hon. M. Hannah Lauck** |
| **CARLTON BROWN,** | ) | |
| *Defendant*. | ) | |

**MOTION FOR COMPASSIONATE RELEASE**
**PURSUANT TO SECTION 603(b) OF FIRST STEP ACT**

Carlton Brown, through counsel, moves this Court to grant him compassionate release under section 603(b) of the First Step Act (codified at 18 U.S.C. § 3582(c)(1)(A)) and order that he be sentenced to time served or, alternatively, the remainder of his sentence be served on home confinement.   In light of the global COVID-19 pandemic, Mr. Brown's underlying health conditions, which include hypertension and hyperinflated lungs, present an "extraordinary and compelling reason" for compassionate release.

### FACTUAL BACKGROUND

On February 22, 1991, Mr. Brown was found guilty by a jury of the following counts of a twenty-three count Indictment: Count One: conspiracy to distribute at least five kilograms of cocaine in violation of 21 U.S.C. § 846; Count Six: violent crime in aid of racketeering activity in violation of Title 18, U.S.C. §1959; Count Sixteen: distribution of cocaine in violation of 21 U.S.C. § 841(a)(1); Count Seventeen: possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1); and Count Twenty-two: continuing criminal enterprise in violation of Title 21, U.S.C. §848.

Mr. Brown's Criminal History is category IV and the offense level was determined to be 43.  Presentence Investigation Report ("PSR"), ECF. No. 72, Worksheets A and C. Application of the federal sentencing guidelines yielded a range of Life. PSR, ECF. No. 72, Worksheet D.

On May 24, 1991, the Court sentenced Mr. Brown to life imprisonment with 5 years of supervised release. Mr. Brown was incarcerated when indicted and was paroled to the Federal Bureau of Prisons after serving 22 years on a life sentence for the state of Virginia. He has spent over thirty-one years (372 months) total in custody.

## ARGUMENT

I.  **THE COURT HAS JURISDICTION TO FIND THERE ARE EXTRAORDINARY AND COMPELLING REASONS TO GRANT MR. BROWN'S COMPASSIONATE RELEASE WITHOUT DELAY.**

### A.  Mr. Brown has exhausted his Administrative Rights

By enacting Section 603(b) of the landmark First Step Act of 2018, Congress amended 18 U.S.C. § 3582(c)(1)(A)(i) to allow defendants, for the first time, to move on their own behalf for a reduction of sentence.  A defendant may file such a motion when he "has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, *whichever is earlier*[.]" First Step Act of 2018, § 603(b), Pub. L. 115-391, 132 Stat. 5194, 5239 (Dec. 21, 2018) (emphasis added).  Congress's objective was to provide a "meaningful and prompt judicial resolution" under the newly minted compassionate release provisions in order to expedite defendants' access to the courts and the courts' consideration of compassionate release motions.  *See, e.g., United States v. Haney*, 2020 WL 1821988 April 13, at S.D.N.Y. 2020).  Mr. Brown submitted an administrative request for compassionate release to the Warden at Hazelton approximately late December 2020/early January 2021.  The Warden has

taken no action on his request and Mr. Brown asserts that this request was sufficient to trigger the 30-day waiting period, which has now passed.  He has satisfied the requirement to exhaust administrative remedies through his request to the prison warden.

### B.  The Court is not bound by Sentencing Commission policies to find "Other" Extraordinary and Compelling Reasons to grant Compassionate Release.

Under § 3582(c)(1)(A), a court may reduce a defendant's sentence if the "court . . . finds that . . . extraordinary and compelling reasons warrant such a reduction" and that the reduction is "consistent with applicable policy statements issued by the Sentencing Commission," and if the § 3553(a) sentencing factors merit a reduction. 18 U.S.C. § 3582(c)(1)(A). Prior to the First Step Act, courts could consider compassionate release only upon motion by the Bureau of Prisons ("BOP"). *See* 18 U.S.C. § 3582(c)(1)(A) (2012). But the BOP used that power so "sparingly," poorly managed the compassionate-release process and failed to establish timeliness standards for reviewing prisoner requests causing delays so substantial, that inmates sometimes died awaiting final BOP decisions. *See United States v. Zullo*, 976 F.3d 228, 231–32 (2nd Cir. 2020), *United States v. Rodriguez*, 451 F. Supp. 3d 392, 395 (E.D. Pa. 2020).

Section 3582(c)(1)(A)(i) does not attempt to define the "extraordinary and compelling reasons" that might merit compassionate release.[1]  The Sentencing Commission addressed the issue in a policy statement, United States Sentencing Guideline § 1B1.13, first issued in 2006 and later updated in November 2018, *before* the First Step Act was enacted.  Accordingly, the statement is directed at BOP requests for sentence reductions and states that a court may reduce a sentence

---

s[1] Other subsections of the compassionate release statute do specify particular circumstances that may merit sentence reductions. *See* 18 U.S.C. § 3582(c)(1)(A)(ii) (focusing on age of the defendant); *id.* § 3582(c)(2). (focusing on defendants sentenced under sentencing ranges that are subsequently lowered by the Sentencing Commission). Section 3582(c)(1)(A)(i), by contrast, uses more open-ended language to capture cases that do not fall within those provisions but meet the heightened "extraordinary and compelling" standard.

if, after considering the § 3553(a) sentencing factors, it determines that "extraordinary and compelling reasons warrant the reduction," that the defendant is not a danger to the community, and that the reduction is consistent with the instant policy statement. U.S.S.G. § 1B1.13.

The Commission set out four categories of "extraordinary and compelling reasons." The first three establish specific circumstances concerning a defendant's medical condition, health and age, and family circumstances. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)–(C). The fourth circumstance labeled "Other Reasons," is the so-called "catch-all" category and which permits a sentence reduction if there exists in the defendant's case an extraordinary and compelling reason other than "the above-listed reasons – but only [a]s determined by the Director of the Bureau of Prisons" *Id.* cmt. n.1(D).

This comment in Note 1(D), seeming to vest authority solely in BOP regarding what "other reasons" qualify for relief, initially created a question as to whether district courts could rely on the "Other Reason" category on which to base Compassionate Release. Yet numerous courts have recognized the judicial authority to find that compassionate release is warranted for "other reasons" than those set forth in U.S.S.G. § 1B1.13. *See, e.g.*, *United States v. Poulios*, No. 2:09-cr-00109-RAJ-TEM, 2020 WL 1922775, at *2 (E.D. Va. Apr. 21, 2020) ("[T]he court may consider a combination of factors including but not limited to those listed in Application Note 1 in evaluating a petitioner's request for a sentence modification under the 'catch-all' provision."); *United States v. Redd*, Case No. 1:97-cr-00006-AJT, 2020 WL 1248493, at *8 (E.D. Va. Mar. 16, 2020) ("[T]he Court joins other courts in concluding that a court may find, independent of any motion, determination or recommendation by the BOP Director, that extraordinary and compelling reasons exist based on facts and circumstances other than those set forth in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C)").

The recent decision by the Fourth Circuit Court of Appeals in *United States v. McCoy*, 981 F.3d 271 (4th Cir. 2020) makes clear that courts are not bound by United States Sentencing Guideline § 1B1.13 but are "vested with independent discretion to determine whether there are extraordinary and compelling reasons to reduce a sentence." *McCoy*, at 285, (quoting *United States v. Bryant,* Crim No. 95-202-CCB-3, 2020 WL 2085471, at *2 (D. Md. Apr. 30, 2020). Applying the provision of the First Step Act that eliminates "stacking" of § 924(c) cases, the Court upheld the District Court's decision to reduce the defendants' lengthy sentences to time served due to the length of the sentences imposed and the disparity between defendants' sentences and those that Congress deemed appropriate under the First Step Act.  The Court stated that "treating the defendants' § 924(c) sentences as an 'extraordinary and compelling' reason for release is not inconsistent with any 'applicable policy statement' of the Sentencing Commission for the simple reason that the commission has yet to issue a policy statement that applies to motions filed by defendants under the recently amended § 3582(c)(1)(A)" *Id*. at * 5. The District Court focused on the length of defendants' sentences, the disparity with current sentencing law, the minimal criminal history of the defendants, and their education and vocational achievements while incarcerated to reduce the defendants' sentence by half – from 35 to 17 years. *United States v. McCoy*, Crim No. 2:03-cr-00197-RAJ-6, 2020 WL _____ (E.D. Va. May 26, 2020).

II.    **THE COVID-19 PANDEMIC PRESENTS AN EXTRAORDINARY AND COMPELLING REASON FOR MR. BROWN'S COMPASSIONATE RELEASE DUE TO MR. BROWN'S PARTICULAR VULNERABILITY.**

   A. **This Court can determine that COVID-19 presents an extraordinary and compelling reason for compassionate release.**

There is ample precedent to support compassionate release in light of prisoners' particular susceptibility and vulnerability to COVID-19.  Courts in the Fourth Circuit and across the country

have found that a defendant's heightened risk and particular vulnerability to COVID-19 in prison constitutes an "extraordinary and compelling reason" in favor of compassionate release.[2]

Mr. Brown is particularly susceptible to COVID-19 and is more likely to suffer dire consequences from the virus due to his underlying medical conditions, which are documented in the attached under seal records from Hazelton, Exhibit A. Mr. Brown is 54 years old and suffers from high blood pressure and hyperinflated lungs which places him at serious risk for a severe or fatal reaction to COVID-19. He is incarcerated at FCI Hazelton where currently four inmates and sixteen staff are positive for COVID-19. One inmate has died from the disease. Four hundred and forty-nine inmates and staff have recovered from the virus.[3] As of February 25, 2021, Mr. Brown has not been vaccinated.

Older individuals and people with preexisting health issues are particularly at risk of experiencing severe side effects or death as a result of this virus. According to the CDC, the

---

[2] *See, e.g.*, *United States v. Poulios*, No. 2:09-cr-00109-RAJ-TEM, 2020 WL 1922775, at *3 (E.D. Va. Apr. 21, 2020) (finding "extraordinary and compelling reasons to modify [defendant's] sentence because of the great risk that COVID-19 poses to a person of [defendant's] age with underlying health conditions"); *Dinning v. United States*, No. 2:12-cr-84, 2020 WL 1889361, at *2 (E.D. Va. Apr. 16, 2020) ("[T]he confluence of petitioner's medical conditions and the COVID-19 pandemic may constitute an extraordinary and compelling reason for sentence modification . . . ."); *United States v. Jones*, No. 3:11-cr-249 (E.D. Va. Apr. 3, 2020) (granting compassionate release and converting remainder of sentence to home confinement in light of "the current public health crisis caused by COVID-19"); *United States v. Edwards*, No. 6:17-cr-3-NKM, 2020 WL 1650406, at *6 (W.D. Va. Apr. 2, 2020) (granting compassionate release); *United States v. Collins*, No. CCB-10-336, 2020 WL 1506176 (D. Md. Mar. 30, 2020) (granting compassionate release to a "non-violent drug offender who has already served a lengthy sentence" even though "it has not been proffered that [defendant] has an underlying health condition which makes him more susceptible to the effects of the virus, and while the risks posed by a defendant's continued residence in a detention facility do not necessarily mandate release"); *United States v. Copeland*, Case No. 2:05-CR-135-DCN (D.S.C. Mar. 24, 2020) (granting compassionate release in part due to "Congress's desire for courts to release individuals the age defendant is, with the ailments defendant has during this current pandemic").
[3] Bureau of Prisons, *COVID-19 Coronavirus*, https://www.bop.gov/coronavirus/ (last visited April 15, 2021).

following groups are at high risk for severe illness from COVID-19: (1) people aged 65 and older; (2) people who live in a nursing home or long-term care facility; (3) people with high-risk conditions, such as chronic lung disease or moderate to severe asthma, serious heart conditions, people who are immunocompromised,[4] obese, or have diabetes, renal failure, or liver disease.[5]

This is no idle concern—federal inmates are catching the virus and dying while issues related to the pandemic are being litigated. On April 1, 2020, a district court in Northern Florida commuted a life sentence for an inmate, Andre Williams, to time-served with 12 months home confinement, finding that his age and medical conditions created a significant risk of "life threatening illness should he be exposed to COVID-19 while incarcerated." *United States v. Williams*, No. 04-cr-95, ECF No. 91 at *7 (N.D. Fla. Apr. 1, 2020). Before the order granting release was filed, Mr. Williams caught coronavirus at the Butner prison complex. He died April 12, 2020, as his family was en route to the prison to take him home. On June 25, 2020, BOP reported that 6,340 inmates and 696 BOP staff members have tested positive for COVID-19; at least 88 federal inmates and one staff member have died as a result.[6] As of April 15, 2021, 46,666 inmates and 5779 BOP staff members have either recovered or tested positive for COVID-19; at

---

[4] *What You Need to Know About Being Immunocompromised During COVID-19,* Penn Medicine, https://www.pennmedicine.org/updates/blogs/health-and-wellness/2020/may/what-it-means-to-be-immunocompromised. Many conditions can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of cortisteroids and other immune weakening medications.

[5] CDC, *People Who are at Higher Risk*, available at https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-higher-risk.html (last visited April 15, 2021).

[6] Fed. Bur. of Prisons, *COVID-19 Tested Positive Cases*, available at https://www.bop.gov/coronavirus/ (includes recovered cases) (last visited April 15, 2021). These results are only lab confirmed positive results. According to several sources within the prison, staff at the Butner prison complex have been using a test on inmates (and potentially staff) that provides results within a matter of a few hours. These results may not be considered "confirmed lab results" reported on BOP's COVID-19 webpage.

least 230 federal inmates and 4 staff members have died. *Id*. These figures underestimate COVID-19's real toll "given the paltry number of tests the federal government has made available" at some BOP facilities,[7] and because BOP did not announce until April 23 that it will begin to test asymptomatic inmates.[8]  In light of the COVID-19 crisis and Mr. Brown's vulnerability to serious injury or death should he contract the disease, Mr. Brown urges the Court to grant him compassionate release and order his immediate release to time served or home incarceration in light of the unprecedented threat posed by COVID-19.

**B.  Mr. Brown is more likely to suffer severe or fatal effects of COVID-19 because of his health conditions.**

Mr. Brown is 54 years of age, and suffers from hypertension. October 6, 2020, he presented to the medical unit complaining of shortness of breath. His blood pressure was 149/91 and wheezing was heard on his inspiratory breathing. Exhibit A at 4-5. He was prescribed Methylprednisolone which is a corticosteroid hormone that  decreases the immune system's response to various diseases.[9] The CDC states that a weakened immune system can make one more likely to get severely ill from COVID-19.[10] Significantly, his records indicate that this was the only time his blood pressure was taken the entire year of 2020. Normal blood pressure is 120/80;

---

[7] *See, e.g.*, *Wilson v. Williams*, No. 4:20-cv-00794, 2020 WL 1940882, at *2 (N.D. Ohio Apr. 22, 2020) (FCI Elkton received only 50 tests); *see also*, Nicholas Chrastil, *Louisiana Federal Prison No Longer Testing Symptomatic Inmates for Coronavirus Due to 'Sustained Transmission'*, The Lens (Mar. 31, 2020), https://thelensnola.org/2020/03/31/louisiana-federal-prison-no-longer-testing-symptomatic-inmates-for-coronavirus-due-to-sustained-transmission/.

[8] Kevin Johnson, *Federal prison system expands virus testing to find hidden asymptomatic infections*, USA Today (Apr. 23, 2020), https://www.usatoday.com/story/news/politics/2020/04/23/coronavirus-federal-prisons-expand-testing-asymptomatic-inmates/3015287001/.

[9] WebMD, *Medlone, 21 Pack Tablet*;  https://www.webmd.com/drugs/2/drug-52999/medlone-21-pack-oral/details (last visited April 12, 2021).

[10] CDC, *COVID-19 People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited April 15, 2021).

anything higher is hypertension and should be monitored and treated.[11] On October 21, 2020, Mr. Brown's lungs were x-rayed due to his continued shortness of breath and wheezing and he was diagnosed with hyperinflated lungs. Exhibit A at 20.  The Mayo Clinic reports that "hyperinflated lungs can be caused by blockages in the air passages or by air sacs that are less elastic, which interferes with the expulsion of air from the lungs and are often seen in people with chronic obstructive pulmonary disease (COPD) — a disorder that includes emphysema. Certain lung problems, such as asthma and cystic fibrosis, also can cause hyperinflation."[12] The records do not reveal follow up on either the hypertension or hyperinflated lungs although Mr. Brown exhibited Stage Two hypertension, which is defined as any value higher than 140/90.[13] This hypertension could be caused by COPD but federal prison officials have so far failed to follow up on his condition.  Hypertension places Mr. Brown in the category of persons at an increased risk of severe illness from the virus that causes COVID-19.[14] Severe illness from COVID-19 is defined as hospitalization, admission to the ICU, intubation or mechanical ventilation, or death. [15]*Id.*

Hypertension is blood pressure that is higher than normal.[16]  The higher the blood pressure levels, the greater the risk for other health problems, such as heart disease, heart attack, and stroke. COVID-19, like other viral illnesses such as the flu, can damage the respiratory system, making it

---

[11]   American Heart Association, *The Facts About High Blood Pressure;* https://www.heart.org/en/health-topics/high-blood-pressure/the-facts-about-high-blood-pressure; American Family Physician, *High Blood Pressure: ACC/AHA Releases Updated Guidelines*, (March 15, 2018), https://www.aafp.org/afp/2018/0315/p413.html.

[12]*Hyperinflated Lungs, What Does It Mean?* THE MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/emphysema/expert-answers/hyperinflated-lungs/faq-20058169 (last visited April 12, 2021).

[13] *Id.*

[14]   CDC, *People With Certain Medical Conditions,* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited April 15, 2020)

[15] *Id.*

[16] CDC, High *Blood Pressure Symptoms and Causes,* www.cdc.gov/bloodpressure/about.htm (last visited January 22, 2021).

more difficult for the heart to work. People with heart failure and other serious heart conditions who contract COVID-19 will endure more harmful symptoms. The Centers for Disease Control and Prevention Records and the New York State Department of Health have warned that people who have high blood pressure and high cholesterol are at a higher risk for a severe or fatal reaction to COVID-19.[17] In essence, people with serious heart conditions are at higher risk for severe illness from COVID-19 and hypertension can indicate a serious heart condition. We already know that Mr. Brown has hyperinflated lungs that can signal a serious heart condition. In a study of COVID-19 patients admitted to the ICU, "29% had heart disease . . . and 37% had other chronic conditions including hypertension or a history of cancer."[18] Hypertension is one of the most commonly associated diseases with severe cases of COVID-19, due to the coexisting illnesses in patients who have been admitted to hospital and their risk of death.[19]

High blood pressure damages arteries and reduces the flow of blood to the heart. That means the heart has to work harder to pump blood. COVID-19 most commonly causes pneumonia, which damages the cardiovascular system. COVID-19 can also damage the heart directly. With a weakened heart from high blood pressure or COPD, it is more difficult for the body to fight off

---

[17] *Id.*; *See also*, New York Department of Health, *Fatalities*, available at https://covid19tracker.health.ny.gov/views/NYS-COVID19-Tracker/NYSDOHCOVID-19Tracker-Fatalities?%3Aembed=yes&%3Atoolbar=no.

[18] Allison Aubrey, *Who's Sickest from COVID-19? These Conditions Tied to Increased Risk*, NPR (Mar. 31, 2020), https://www.npr.org/sections/coronavirus-liveupdates/2020/03/31/824846243/whos-sickest-from-covid-19-these-conditions-tied-toincreased-risk (last visited January 22, 2021).

[19] Williams, Bryan, *Hypertension, Renin–Angiotensin–Aldosterone System Inhibition, and COVID-19.* THE LANCET, 14 May 2020, www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)31131-4/fulltext.

the disease.[20]  Studies have found that persons suffering from hypertension have a greater risk of more serious complications of COVID-19[21]:

- In China, 25% to 50% of the people who were admitted to hospitals with COVID-19 also suffered from high blood pressure or other serious health conditions.

- In Italy, 76% of the people who died from COVID-19 also suffered from high blood pressure.

- People with high blood pressure (or hypertension) have a 6% higher risk of death from COVID-19 than the overall population.

- A study of 5,000 hospitalized COVID-19 patients published on a website for the Journal of the American Medical Association showed that 57% had high blood pressure.

- The report revealed "78% of COVID-19 patients in the U.S. requiring admission to the intensive care unit had at least one underlying condition. And 94% of hospitalized patients who died had an underlying condition."

Numerous courts have found extraordinary and compelling circumstances to release a defendant who suffered from hypertension, asthma, heart conditions, and obesity due to the COVID-19 pandemic that has ravaged the prison system, our country, and the world.  *See, e.g.*, *United States v. Harper*, No. 7:18-cr-25, 2020 WL 2046381, at *1 (W.D. Va. Apr. 28, 2020) (granting compassionate release where defendant had heart disease, asthma, hypertension, and sleep apnea); *United States v. Rodriguez*, No. 2:03-cr-271, 2020 WL 1627331, at *1 (E.D. Pa. Apr. 1, 2020) (granting compassionate release based on defendant having hypertension and diabetes, paired with the fact of a COVID-19 outbreak in FCI-Elkton and that defendant had served the majority of his sentence); *United States v. Scparta*, No. 18-cr-578, 2020 WL 1910481, at *9 (S.D.N.Y. Apr. 20, 2020) (granting compassionate release where defendant had hypertension,

---

[20] Nazario, Brunilda, *High Blood Pressure & Coronavirus (Higher-Risk People): Symptoms, Complications, Treatments.* WEBMD, 18 May 2020, www.webmd.com/lung/coronavirus-high-blood-pressure#1.
[21] *Id.*

sleep apnea, high blood pressure, and high cholesterol); *United States v. Gross*, No. 15-cr-769, 2020 WL 1673244, at *1 (S.D.N.Y. Apr. 6, 2020) (granting compassionate release where defendant was severely overweight and suffered from high blood pressure and sleep apnea).

### C. **Mr. Brown is particularly susceptible to contracting COVID-19 because of his conditions of confinement.**

Since January 2020, COVID-19 has spread widely—and rapidly—throughout the United States. Positive cases have been confirmed in all 50 states and the District of Columbia.[22] Since March 21, 2020, the total number of *confirmed* cases in the United States has skyrocketed from 15,219 to 31,455,995 as of April 15, 2021; the number of deaths has risen from 201 to 564,715.[23] These numbers are growing, and most likely understate the problem, as the United States in general, and prisons in particular, are vastly behind where they need to be in testing for this virus. With the number of variant mutant strains rising in this county, cases have inevitably risen. The World Health Organization warned of a global uptick in COVID-19 cases. As of March 3, 2021, there were 2.6 million new cases reported across the world that week, up 7% from the prior week.[24] Now, with questions surrounding the side effects caused by the Johnson and Johnson vaccination and the pause enforced by the CD in its distribution, the number of new cases will continue to grow.[25] Given the rapid onset of symptoms and the fact that many carriers are asymptomatic, the unfortunate reality is that once there is a positive case at the prison, it may be too late to prevent further spread.

---

[22]CDC, *COVID-19 Cases in the US*, available at https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

[23] Johns Hopkins University, *Coronavirus Resource Center,* JOHN HOPKINS UNIVERSITY AND MEDICINE, https://coronavirus.jhu.edu/map.html, (last visited April 15, 2021).

[24] CNBC, *World Health Organization Warns of Global Uptick in COVID-19 Cases After Weeks of Decline*, (March 3, 2021) https://www.cnbc.com/2021/03/03/who-warns-of-uptick-in-covid-cases-globally-after-weeks-of-decline.html, (last visited March 6, 2021).

[25] CDC, *COVID-19 Recommendation to Pause Use of Johnson and Johnson Janssen COVID-19 Vaccine*, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/JJUpdate.htm.l

Mr. Brown's incarceration at FCI Hazelton does not allow for social distancing and, if the virus were to hit his living quarters, it would spread very quickly.  He reports that he recently got a new bunkmate who was previously diagnosed with COVID-19. They sleep in bunk beds and share a toilet and a sink in their cell. Mr. Brown works in the laundry unit which requires him to move about the prison and interact with other prisoners. He is not able to properly social distance.

The nation's prison system is particularly ill-equipped to handle the spread of a disease as contagious and deadly as COVID-19.  COVID-19 can enter a facility and spread rapidly, entirely undetected.  Indeed, the Director of the CDC warned that up to 25 percent of people infected with COVID-19 "may not show symptoms."[26]  More recent research has indicated that as many as 80% of the people infected with the virus may be asymptomatic.[27]  The virus has already spread rapidly in BOP and state facilities.[28]   Due to the crowded and confined nature of a detention facility, the spread of the virus in the prisons and jails is far outpacing its spread in the community.

---

[26] Apoorva Mandavilli, *Infected but Feeling Fine: The Unwitting Coronavirus Spreaders*, NEW YORK TIMES (March 31, 2020) available at https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html (last visited Apr. 12, 2021).  *See also,* CDC, *"How Coronavirus Spreads"* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited Apr. 12, 2021).

[27] *As Many as 80 Percent of People with COVID-19 Aren't Aware They Have the Virus*, HEALTHLINE, https://www.healthline.com/health-news/50-percent-of-people-with-covid19-not-aware-have-virus (last visited January 16, 2021).

[28] *See* Timothy Williams, Benjamin Weiser and William K. Rashbaum, *Jails Are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars,* NEW YORK TIMES (Mar. 30, 2020), available at https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html (last visited April 15, 2021) ("Hundreds of Covid-19 diagnoses have been confirmed at local, state and federal correctional facilities — almost certainly an undercount, given a lack of testing and the virus's rapid spread — leading to hunger strikes in immigrant detention centers and demands for more protection from prison employee unions").

Conditions of confinement create the ideal environment for the transmission of contagious disease.[29] Jails and prison, which house 2 million incarcerated people, have had some of the largest rates of COVID-19 in the country[30] "Prisons are petri dishes for contagious respiratory illnesses."[31] Inmates cycle in and out of jails and prisons, and people who work in the facilities leave and return daily.  According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" as "infection control is challenging in these settings."[32]  Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[33]  The conditions of confinement not only affect incarcerated individuals, but also the community at large.  "With 2.3 million people in the United States in prison or jail on any given day, an outbreak in these facilities poses a threat to the entire country."[34] In April of last year, one COVID-19 model estimated that jails, as currently managed, could account for 99,000 deaths that have not been recognized by other models.[35]

---

[29] Joseph A. Bick (2007) Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, https://doi.org/10.1086/521910.

[30]      Zachary    Green,    *Prisons,    Jails    are    Covid    Hotspots*, https://www.pbs.org/newshour/show/prisons-jails-are-covid-19-hotspots-is-vaccinating-inmates-a-priority (last visited April 15, 2021)

[31] *Letters to the Editor: A Prison Doctor's Stark Warning on Coronavirus, Jails and Prisons*, Los Angeles Times (Mar. 20, 2020), at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration.

[32] *Achieving A Fair and Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States,* (March 2, 2020), *at* https://bit.ly/2W9V6oS.

[33] Nicole Wetsman, *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020), https://bit.ly/2TNcNZY.

[34] *Explainer: Prisons and Jails Are Particularly Vulnerable to COVID)-19 Outbreaks*, The Justice Collaborative, available at https://thejusticecollaborative.com/wpcontent/uploads/2020/03/TJCVulnerabilityofPrisonsandJailstoCOVID19Explainer.pdf.

[35] *See COVID-19 Model Finds Nearly 100,000 More Deaths Than Current Estimates, Due to Failures to Reduce Jails*, ACLU (Apr. 22, 2020), available at https://www.aclu.org/sites/default/files/field_document/aclu_covid19-jail-report_2020-8_1.pdf.

The alarming spread of COVID-19 in BOP facilities confirms that, despite its efforts, BOP cannot safeguard prisoners. For example, on April 27, 2020 – more than three weeks after BOP implemented Phase 5 of its COVID-19 Action Plan, which included a 14-day inmate quarantine – Butner Medium I reported a one-day increase of 113 inmates with new confirmed positive cases, almost tripling the number of positive cases reported the day before.[36] This is not an outlier.[37] Courts have criticized BOP's overall response as "insufficient" given "the number of infections and deaths which have already occurred in federal custodial institutions,"[38] and one court described BOP efforts at FCI Elkton as fighting "a losing battle. A losing battle for staff. A losing battle for inmates." *Wilson v. Williams*, No. 4:20-cv-00794, 2020 WL 1940882, at *1 (N.D. Ohio Apr. 22, 2020).

Even in the best circumstances, inmates cannot provide self-care because their incarceration prevents them from following CDC guidance: "People in jails and prisons cannot practice social distancing, control their exposure to large groups, practice increased hygiene, wear protective clothing, obtain specific products for cleaning and laundry, avoid frequently touched surfaces, or sanitize their own environment." *United States v. Skelos*, 15-CR-317 (KMW), 2020 WL 1847558, at *1 (S.D.N.Y. Apr. 12, 2020). There are serious doubts that BOP is adequately caring for prisoners as the COVID-19 pandemic continues to unfold.[39]

---

[36] Fed. Bur. of Prisons, *COVID-19 Tested Positive Cases*, https://www.bop.gov/coronavirus/ (reporting 173 inmates with positive cases on April 27, 2020, an increase from 60 inmate cases reported on April 26, 2020).

[37] The Marshall Project, *Tracking the Spread of Coronavirus in Prisons* (Apr. 24, 2020), https://www.themarshallproject.org/2020/04/24/tracking-the-spread-of-coronavirus-in-prisons ("The number of new cases among prisoners is more than doubling each week . . ..").

[38] *United States v. Joling*, No. 6:11-cr-60131-AA, 2020 WL 1903280, at *5 (D. Or. Apr. 17, 2020).

[39] The Inspector General has found widespread medical staffing shortages across BOP facilities that "lower staff morale, increase staff workload, and ultimately can reduce inmates' access to routine medical care." *Review of the Federal Bureau of Prisons' Medical Staffing Challenges*,

**D. The spread of Covid-19 shows that the policies established by BOP are ineffectual.**

The virus is wildly infectious. It survives "on surfaces for days."[40] But its real danger is described in a single word: aerosol. Unlike many diseases, "the virus can remain viable and infectious in aerosols for hours" – just breathing will spread the virus, no cough or sneeze required.[41]  In a study published in  the Centers for Disease Control journal, researchers confirmed what was already suspected: "SARS-CoV-2 aerosol was detected" in air samples taken in hospital ICUs and general wards up to four meters from infected patients.[42] Prison officials are powerless to reduce breathing, coughing, sneezing, or movement in the cramped, shared spaces of prisons—the phone blocks, the showers, the legal libraries. Just as it spreads easily in the most controlled environments – hospitals – the virus spreads easily in the least prepared – prisons.

A scientific study reported last June shows that even people who are asymptomatic from Covid-19 (no cough, fever, etc.) are experiencing damage to their lungs, including "minor lung inflammation – akin to walking pneumonia – while exhibiting no other symptoms of the coronavirus. The study shows that being asymptomatic doesn't always mean that no damage has occurred in someone's body."[43] Thus, Mr. Brown could sustain damage to his lungs even without

---

Office of the Inspector General (March 2016), available at https://oig.justice.gov/reports/2016/e1602.pdf.

[40] Mary Van Beusekom, *U.S. Studies Offer Clues to COVID-19 Swift Spread, Severity*, Cntr. for Infectious Disease Research & Policy (Mar. 18, 2020) (available at: https://bit.ly/3b9fk70).

[41] *Id.*

[42] Guo Zhen-Dong, et al., *Aerosol and Surface Distribution of Severe Acute Respiratory Syndrome Coronavirus 2 in Hospital Wards, Wuhan, China*, Emerging Infectious Disease (July 2020) (available at: https://bit.ly/2xqvx98) (peer-reviewed journal published by the Centers for Disease Control). The study found that even in hospitals, the "virus was widely distributed on floors, computer mice, trash cans, and sickbed handrails." *Id.*

[43] Nat'l Pub. Radio (NPR), *We Still Don't Fully Understand the Label "Asymptomatic,"* (June 23, 2020), https://www.npr.org/sections/goatsandsoda/2020/06/23/864536258/we-still-dont-fully-understand-the-label-asymptomatic.

exhibiting symptoms of the virus. Or, more likely, he will become very ill and/or die as a result of the virus. What is particularly concerning about the new studies is that Mr. Brown could be sustaining damage to his lungs without showing other symptoms. And without other symptoms, it is highly unlikely that BOP is going to be vigilant about monitoring and testing his lungs for damage, despite the risks it could pose for pneumonia.  They are not vigilant even when he has a demonstrated need for monitoring because of his hyperinflated lungs.

By reducing the potential spread of COVID-19 within the prison system, Mr. Brown's release will benefit public safety.  *See, e.g., United States v. Harris*, No. 19-cr-356, 2020 WL 1482342, at *1 (D.D.C. Mar. 26, 2020) ("The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on . . . strict conditions.").[44] His release would also reduce the existing strain on BOP's healthcare facilities.[45]

---

[44] *See also United States v. Davis*, No. 1:20-cr-9-ELH, 2020 WL 1529158, at *4 (D. Md. Mar. 30, 2020) ("If released, Davis will be removed from a custodial setting where the risk of infection is higher for everyone, including the healthy, and he will live in the community where he is able to practice social distancing, self-quarantine, self-isolate if infected, and seek medical treatment if necessary."); *United States v. Mclean,* No. 19-cr-380, Dkt. No. 21 (D.D.C. Mar. 28, 2020) ("As counsel for the Defendant candidly concedes, the facts and evidence that the Court previously weighed in concluding that Defendant posed a danger to the community have not changed – with one exception. That one exception – COVID-19 – however, not only rebuts the statutory presumption of dangerousness, *see* 18 U.S.C. § 3142(e), but tilts the balance in favor of release."); *United States v. Jaffee*, No. 19-cr-88, Minute Order (D.D.C. Mar. 26, 2020) (releasing defendant with criminal history in gun & drug case, citing "palpable" risk of spread in jail and "real" risk of "overburdening the jail's healthcare resources"; "the Court is . . . convinced that incarcerating the defendant while the current COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's release to home confinement").

[45] *Review of the Federal Bureau of Prisons' Medical Staffing Challenges*, Office of the Inspector General (March 2016), available at https://oig.justice.gov/reports/2016/e1602.pdf (detailing BOP's medical staff shortages).

In sum, Mr. Brown's particular susceptibility to COVID-19 while incarcerated, in combination with the mortal risk to Mr. Brown given his medical condition, constitutes an extraordinary and compelling reason warranting Mr. Brown's compassionate release.

### III. OTHER REASONS WHY MR. BROWN SHOULD BE GRANTED COMPASSIONATE RELEASE.

#### A. Mr. Brown was never told specifics of a plea deal and was then penalized for proceeding to trial.

Mr. Brown informed counsel that the United States offered his trial attorney a plea deal of 30 years if he cooperated. His attorney, however, never informed him of the terms of the deal so he was not able to make an informed choice on whether to proceed to trial. Without this knowledge, Mr. Brown elected to go to trial and received a mandatory life conviction.

Mandatory minimum sentencing mandates have been criticized by judges and attorneys alike as blunt instruments that, rather than serving their original, intended purpose—"to impose harsher punishments on a select group of the most culpable defendants"—have instead resulted in unfair sentences and a severe power imbalance during plea negotiations. *See, e.g.,* Nat'l Ass'n of Crim. Def. Law., The Trial Penalty: The Sixth Amendment Right to Trial on The Verge of Extinction and How to Save It 3 (2018)[46] [hereinafter Trial Penalty Report].  While presiding judges are meant to retain ultimate authority over final sentencing decisions, in practice, mandatory minimum sentence statutes prevent judges from exercising discretion.  Rather than allow assessment of culpability and mitigating circumstances on a case-by-case basis, mandatory minimum penalties are triggered solely by the prosecutor's charging decisions.  Compassionate release and § 3582(c) provide an appropriate method to give secondary review to these sentences

---

[46] *The Trial Penalty: The Sixth Amendment Right to Trial on the Verge of Extinction and How to Save It*, NATIONAL ASSOC. OF CRIMINAL DEFENSE LAWYERS, www.nacdl.org/trialpenaltyreport

and remedy any inequities.  Courts considering § 3553(a) factors have found sentencing courts' concerns about mandatory minimums and sentence disproportionality support a finding of extraordinary and compelling reasons to reduce a sentence. *See, e.g., Maumau,* 2020 U.S. Dist. LEXIS 28392, at *11 (finding support for sentence reduction where the court "repeatedly expressed its concern regarding the length" of a sentence); *United States v. Chan*, 2020 U.S. Dist. LEXIS 56232, at *4-5 (N.D.Ca. March 31, 2020) (court would grant relief where the sentencing judge did not want to impose a mandatory minimum when it resulted in a sentence significantly greater than § 3553(a) justified).

In fact, excessive sentences—especially "trial penalty" sentences which are vastly disproportionate from plea offers—undermine the respect for law and the integrity of the justice system. *See* 18 U.S.C. § 3553(a)(2)(A) (mandating an imposed sentence needs to promote respect for the law); *see also* Trial Penalty Report at 3 (quoting former United States District Judge John Gleeson, E.D.N.Y.).

A trial penalty that forces a defendant to either gamble with decades of his life or give up his constitutional right to hold the government to its burden of proof, at a fair trial, is a deeply insidious problem, inconsistent with notions of fundamental fairness and the core values of our criminal justice system. *See, e.g.,* Trial Penalty Report at 9, 39.  One way to remedy such injustices is through judicial "second looks"—such as compassionate release—which allow courts to "review lengthy sentences to ensure [they] are proportionate over time" and to act when they are not. *Id*. at 60.

Courts have found extraordinary and compelling circumstances warranting sentence reduction in cases like this where defendants either faced disproportionate "trial penalty" sentences or where prosecutors responded to rejected plea bargains by increasing charges. *See e.g., Haynes*,

19

456 F.Supp.2d at 514 ("The Court concludes, based on the facts . . . — including the brutal impact of Haynes's original sentence, its drastic severity as compared to codefendant River's ten-year [**39]  term, its harshness as compared to the sentences imposed on similar and even more severe criminal conduct today, and the extent to which that brutal sentence was a penalty for Haynes's exercise of his constitutional right to trial—that the FSA' elimination of the § 924(c) sentencing weaponry that prosecutors employed to require that sentence — is an extraordinary and compelling circumstance warranting relief under § 3582(c)").

### IV.   IN REIMPOSING A SENTENCE, THE COURT MUST CONSIDER THE FACTORS LISTED IN TITLE 18 U.S. CODE § 3553(a).

#### A.   The nature and circumstances of the offense:

This Court must consider the nature and circumstances of the offense and the history and characteristics of the defendant when reimposing a sentence.  *See* 18 U.S.C. § 3553(a)(1).  The crimes are significant in that the Eugene Johnson ("Johnson") and Brown families joined together to distribute drugs, but it should be noted that the PSR states that Mr. Brown tried to distance his family from Johnson because of the violence associated with Johnson. PSR, #72, ¶ 72. However, Johnson eventually became the leader of the Brown family, as well as his own.  *Id*., ¶ 33.

#### B.   The history and characteristics of the defendant:

Mr. Brown grew up with seven siblings (one his twin sister). His father was absent. His mother provided for the children as best she could. Their income situation is described in the Presentence Report as "below average." PSR, ECF #72, ¶ 91. The fact that three of Mr. Brown's siblings were codefendants in his case and one was murdered at the time this case went to trial illuminates the grave circumstances the children faced and the lack of leadership, direction and supervision they suffered as they grew up. *Id.*   Mr. Brown's first criminal charge, for which he was found not guilty, was for stealing Tootsie Rolls at age 16. He was found guilty of auto theft at

age 17. It was not until Mr. Brown came under the influence of Eugene Johnson at age 18 that the offenses became violent. *Id.* at ¶ 32. Without strong parental supervision or role modeling, Mr. Brown looked to Johnson for direction and Johnson led Mr. Brown down the wrong path.

Mr. Brown was only marginally successful in school. He grades were below average and he took special education classes.  His attendance was described as "fair" (absent approximately one quarter of the time) until he was eventually expelled from high school for fighting in the 10th grade. *Id* at ¶ 93. Without a sufficient education, he held only part time menial jobs by the time of his sentencing.

Crime is a complex issue that may stem from many sources, but a lack of education, generational poverty, and the rupture of family structure each seem to play a prominent role.[47] Poverty has long been recognized as a predictor of crime.  "Living in or near poverty has always been a form of exile, of being cut off from the larger society." [48] One of the reasons that poverty has been associated with crime is because it is an opportunity for the poor to acquire materials that they could otherwise not afford. Most crime can be linked to high poverty neighborhoods. Criminal behaviors can spread throughout a community, tempting others to commit crimes.[49] Poverty causes crime and crime causes poverty. As Richard Ross, the Philadelphia Police Commissioner stated in 2018, "[w]hen you walk these neighborhoods and you see what you see, the struggle from day to day just to survive, it's discouraging. All this poverty leads to hopelessness and desperation. And

[47]Anthony Holzman-Escareno, *The Cause of Crime,* https://hilo.hawaii.edu/campuscenter/hohonu/volumes/documents/Vol07x03TheCauseofCrime.pdf
[48]Krugman, Paul, *Poverty is Poison,* THE NEW YORK TIMES, February 18, 2008. https://www.nytimes.com/2008/02/18/opinion/18krugman.html
[49] Jens Ludwig Greg, J. Duncan, Paul Hirschfield, *Urban Poverty and Juvenile Crime: Evidence from a Randomized Housing-Mobility Experiment,* THE QUARTERLY JOURNAL OF ECONOMICS, May 2001, https://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.520.8961&rep=rep1&type=pdf

it definitely feeds right into the problem of violence. Economics, without a doubt, becomes the common denominator."[50]

There is a direct relationship between poverty and education. Children in poverty can have an "actual or perceived inferior education" due to the lack of available qualified schools. Poor school performance or low intelligence is an indicator of future criminal behavior. One of the main reasons an individual commits crime is because it gives them an opportunity to balance resources without possessing the adequate skills to do so legitimately. Adolescents in poor neighborhoods also have few quality jobs or role models to look up to. This can multiply the chance of children hanging out in the streets associating with gang members. [51]

Children that reside in single parent households have a much higher chance of becoming involved in crime and also have a stronger tendency to join gangs, as most gang members come from broken homes. Single parent households may also induce violent behavior in juveniles. [52] Also, the best indicator of future violence in boys is growing up without a father.[53] Single parent homes do not only influence the child in the home, but they also influence the community.  Most communities that have a high ratio of single parent families also carry high crime rates.[54] Fractured families have a profound emotional effect on juveniles. Violent criminals from broken homes usually did not receive an adequate amount of love, affection or dedication from their parents.

---

[50] John N. Mitchell, *Breaking Poverty: Crime, Poverty Often Linked,* THE PHILADELPHIA TRIBUNE, September 18, 2018, https://whyy.org/articles/breaking-poverty-crime-poverty-often-linked/
[51] Anthony Holzman-Escareno, *supra,* note 47.
[52] Barr, William P., *Crime, Poverty, and the Family.* 1992. THE HERITAGE FOUNDATION, http://www.heritage.org/Research/Crime/HL401.cfm.
[53] Dwyer, William Scott. *Crime and Poverty*, Part 2. Rebirth of Reason. February 18, 2008., www.rebirthofreason.com/articles.
[54] Fagan, Patrick F. *The Real Root Causes of Violent Crime: The Breakdown of Marriage, Family, and Community.* THE HERITAGE FOUNDATION, http://www.heritage.org/Research/Crime/BG1026.cfm.

Rejection and conflict are often associated with broken families which can bring a sense of dismay and a diminishing of family life. This can lead to youth releasing their frustration on other people in the community. [55]

All three factors, a lack of education, living in poverty, and being raised in a single parent home, came together to predispose Mr. Brown to a life of crime. He is a victim of his environment. In many ways, he never had a chance. It is little wonder Mr. Brown began to sell drugs and to follow Johnson as Johnson became his role model.

    **C.**  **The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense and to afford adequate deterrence to criminal conduct:**

Mr. Brown was sentenced to life in prison for his part in the activities set forth in the Indictment. He served 22 years under a life sentence in the Virginia penal system before being paroled to the federal system to serve his life sentence. He has spent 31 years total in custody for crimes that occurred during the reign of the Johnson gang; almost ten of those years have been spent in federal custody. Mr. Brown is now 54 years old and no longer the impressionable 18-year-old directed by Johnson. A life sentence and 31 years in custody reflects the seriousness of the offense, promotes respect for the law, and provides an adequate deterrence to others who may consider this path of criminal conduct. Mr. Brown has been justly punished. Although he was sentenced to life in prison, he was not sentenced to death and to allow him to die from COVID-19 is surely not what the Court intended when he was sentenced.

---

[55] *Id.*

### D. **Mr. Brown is not a danger to the community.**

Mr. Brown is no longer a danger to the community. He has been incarcerated for over 31 years and is no longer the young impressionable man who was influenced by Johnson. He has learned the heavy price extracted by those who violate the law. At 54 years of age, he is now among the group of prisoners with the lowest recidivism rate. Older prisoners have the lowest recidivism rate of any age group. U.S. recidivism rates decrease as prisoners get older – dropping to 5% for those age 50 to 64 and reaching less than 1% by age 65.[56] Mr. Brown should be seriously considered for a reduction in his sentence.

## CONCLUSION

The failures of Mr. Brown's counsel in clarifying the plea offer, coupled with his particular susceptibility to COVID-19, supports his request for compassionate release. The relevant 18 U.S.C. § 3553(a) factors favor a sentence reduction. Mr. Brown is not a danger to the community.

Mr. Brown is subject to a particularized risk of contracting the disease in a prison environment due to his shortness of breath and hypertension. The virus thrives in densely packed populations, and federal prisons are ill-equipped to contain the pandemic and prevent COVID-19 from spreading to inmates like Mr. Brown. Granting Mr. Brown compassionate release is the only prudent and just response to the extraordinary and compelling circumstances created by the novel coronavirus. Mr. Brown respectfully requests that this Court order his immediate compassionate release and impose time served or release him for home incarceration under release conditions approved by the U.S. Probation Office for as long as this Court deems necessary.

---

[56] Matt Clarke, *Aging Prison Population Finds Parole Elusive*, PRISON LEGAL NEWS, January 8, 2019, https://www.prisonlegalnews.org/news/2019/jan/8/aging-prison-population-finds-parole-elusive/#:~:text=In%20America%2C%20elderly%20prisoners%20face,than%201%25%20by%20age%2065.

Respectfully Submitted,

**CARLTON BROWN**

By: _____/s/_____

Ann M. Reardon, Esq.
VSB No. 24230
THORSENALLEN, LLP
5413 Patterson Avenue, Suite 201
P. O. Box 17094
Richmond, Virginia 23226
Telephone: (804) 317-5150
Facsimile: (804) 447-7813
annreardonlaw@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that on April 19, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to:

Stephen Miller
US Attorney's Office
SunTrust Building
919 East Main Street
Suite 1900
Richmond, VA 23219

_____/s/_____
Ann M. Reardon, Esq.
VSB No. 24230
THORSENALLEN, LLP
5413 Patterson Avenue, Suite 201
P. O. Box 17094
Richmond, Virginia 23226
Telephone: (804) 317-5150
Facsimile: (804) 447-7813
annreardonlaw@gmail.com