IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

*Richmond Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | CRIMINAL NO. 3:90-CR-113 |
| CARLTON BROWN, | ) | |
| | ) | |
| Defendant. | ) | |

**Response of the United States in Opposition to
Defendant's Motion for Compassionate Release**

The United States files this response in opposition to defendant Carlton Brown's motion

for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). Defendant is currently serving a

life sentence at USP Hazelton for conspiracy to distribute at least five kilograms of cocaine,

violent crime in aid of racketeering activity, distribution of cocaine, possession of a firearm by a

person previously convicted of a crime punishable by imprisonment for a term exceeding one

year, and engaging in a continuing criminal enterprise. He seeks early release from prison due to

hypertension and hyperinflated lungs. Because defendant failed to exhaust his administrative

remedies, has already received at both of his COVID-19 vaccinations, and the statutory

sentencing factors in 18 U.S.C. § 3553(a) weigh against release, the Court should deny his

motion.

**Background**

## I.  Facts.

Defendant was a principle player in an extensive violent street gang that plagued the

Blackwell section of Richmond in the 1980s. During the course of the gang's operation,

authorities believed that "at least 300 individuals . . . participated in the activities of the

organization and the Richmond City Police targeted at least 100 of these individuals as suspects who committed criminal acts." Presentence Report ("PSI"), ECF No. 72, p. 5, ¶ 28.

The gang began in the 1970s when several brothers in the Johnson family began selling marijuana. By 1983, the brothers had switched to selling cocaine. Defendant and several of his siblings joined the Johnson brothers in about 1984 in what became known as the Johnson-Brown Gang.[1] ECF No. 72, p. 5, ¶ 28, p. 6, ¶ 32. Defendant was the leader of the Brown faction of the Johnson-Brown gang, though Eugene Johnson became the overall leader as he had a supplier of large quantities of cocaine. ECF No. 72, p. 6, ¶ 33. The Johnsons and the Browns then developed a "symbiotic relationship that existed throughout the next six years." ECF No. 72. P. 6, ¶ 33. While the specific amounts of cocaine distributed by the Johnson-Brown gang is unknown, the gang was held accountable for the distribution of "at least five kilograms of cocaine," which was purchased in kilogram quantities. ECF No. 72, p. 6, ¶ 34.

Contrary to defendant's assertions,[2] he was not opposed to committing acts of violence in furtherance of the business of the Johnson-Brown gang. Indeed, he actively participated in several significant acts of violence. For instance, on May 4, 1988, defendant and his gang members murdered Vincent Ricardo Dean, Jr., as the victim drove a vehicle that contained

---

[1] Perhaps trying to distance himself from his full measure of responsibility for his criminal acts, defendant refers to the gang as simply the Johnson Gang. Brief of Defendant at 23.

[2] Defendant asserts that he attempted to distance himself from Eugene Johnson "because of the violence associated with Johnson." Brief of Defendant at 20. The source for defendant's assertion, the PSI, actually states that "[t]he Browns, under Carlton's leadership, tried to distant [sic] themselves from Eugene Johnson because of the violence associated directly **against** Eugene Johnson by the rival Flax gang." (emphasis added). ECF No. 72, p. 13, ¶ 72. Indeed, the PSI reports one such incident in which Flax Gang members got into a shoot-out with Eugene Johnson and another member of the Johnson-Brown Gang. *Id*. at p. 10, ¶ 58. It was not that Brown was opposed to committing acts of violence. His extensive record of extreme violence proves that. Rather, he simply wanted to avoid being on the receiving end of that violence and felt distributing drugs with the target of such violence might be bad for his personal health.

another adult male and three minor children. Defendant and his Johnson-Brown confederates had discussed the murder prior to its commission. When the murder team was in place, defendant gave the signal for the assassin to fire the fatal shots into the victim. ECF No. 72, p. 8, ¶¶ 39-41. Moments before dying, the victim told a witness that he had been attacked by "Betty's Boys," referring to the Brown brothers.[3] The witness who heard this statement said she was later "jumped" by defendant, his brother Clayton and their mother, Betty, as the witness attempted to get home. The Browns told the witness not to talk to the police about the incident. ECF No. 72, p. 7, ¶ 40.

Defendant also participated in the murder of Leslie Braxton. Eugene Johnson had offered to pay two Johnson-Brown gang members $5,000 up front and one kilogram of cocaine after the fact to kill Braxton. The two unsuccessfully attempted to murder Braxton one time. They succeeded on their second attempt. Defendant was present at that second attempt, as part of a group that would kill Braxton if the two charged with the murder failed again. ECF No. 72, p. 8, ¶ 48-p. 9, ¶ 52.

On July 13, 1989, Eugene Johnson got into a shoot-out with two other individuals. Defendant, his sister and another individual arrived on the scene. Police subsequently stopped the car they were in, recovering from it three weapons, including an Uzi and a streetsweeper.[4] ECF No. 72, p. 10, ¶¶ 55-58.

In addition, at the time of his indictment in this case, defendant was already serving a state life sentence for yet another murder and the attempted murder of two other individuals.

---

[3] Defendant's mother is Betty Brown. ECF No. 72, p. 18, ¶ 91.

[4] The streetsweeper is a 12-gauge shotgun with a spring-driven revolving cylinder that holds 12 rounds of ammunition. It was designed as a "military, security and anti-terrorism weapon." https://www.atf.gov/file/55426/download.

Defendant and his associates shot a 16-year-old in the head, and used firearms to attempt to murder two others. ECF No. 72, pp. 17-18, ¶ 88.

And, defendant was no small player in the Johnson-Brown organization. Indeed, he was the leader of the Brown faction of the gang. ECF No. 72, p. 6, ¶ 33. He was also the first lieutenant of the overall gang, and a trusted friend of Eugene Johnson, the overall leader. He would act whenever Johnson was unavailable. ECF No. 72, pp. 11-12, ¶ 64.

## II. Defendant's motion for compassionate release.

The Bureau of Prisons has no record that defendant filed a request with his institution for compassionate release.[5] He filed his motion with this Court on April 19, 2021. ECF No. 94. Defendant did not provide a release plan with his motion. He filed a brief one on April 29, 2019, with his Supplemental Motion. ECF No. 100.

## III. BOP efforts to mitigate the effects of COVID-19.

The federal Bureau of Prisons ("BOP") has implemented several measures to contain the spread of the virus within prison populations. In recent months, BOP has made significant progress in distributing and administering vaccines to staff and inmates at its facilities. BOP has

---

[5] On April 20, 2021, undersigned counsel contacted counsel for defendant to inform her that the BOP does not have a record of defendant submitting a request for compassionate release, and requesting from counsel a record of the submission he now claims he made. To date, the United States has received no support for defendant's assertion. Counsel for defendant has asserted to undersigned counsel that defendant provided a copy of a request for compassionate release to his BOP counselor, but has no record of that occurring. The counselor identified by defendant as the person to whom he submitted the request, Counselor McDuffie, informed undersigned counsel that he had not received a request form from defendant. At present, then, defendant has not established that he has exhausted his administrative remedies. But, this has been an issue for some time as the present motion has been in the works since well before it was filed. In the time that has passed, defendant could have filed a request (and retained a copy), or refiled the one he asserts he previously filed. By now, he would either have a satisfactory answer from BOP or satisfied his gate-keeping requirements for filing his present motion. Until that happens, however, he may not proceed on his motion.

also maintained COVID-19 protocols designed to prevent community spread, including limiting access to prisons, restricting prisoner movement within prisons, requiring screening and testing, providing masks and hand cleaners, and separating ill inmates from the rest of the population. Further, BOP has devoted substantial resources to placing vulnerable inmates in home confinement.

Since December 2020, BOP has been steadily administering COVID-19 vaccines to inmates and staff.  As of May 5, 2021, BOP has administered a total of 158,467 doses of the vaccine at its facilities.  *COVID-19 Vaccine Implementation*, BOP, https://www.bop.gov/coronavirus/.  BOP has been distributing the vaccine consistent with guidance issued by the Centers for Disease Control and Prevention ("CDC").  *COVID-19 Vaccine Guidance*, BOP 4 (Mar. 11, 2021), https://www.bop.gov/resources/pdfs/covid19_vaccine_guidance_20210311.pdf.  BOP has offered the vaccine to all staff members.  Becky Sullivan, *All Federal Inmates to Be Offered Vaccine by Mid-May, BOP Director Says*, NPR (Apr. 16, 2021), https://www.npr.org/2021/04/16/988237102/all-federal-inmates-to-be-offered-vaccine-by-mid-may-bop-director-says.  By mid-May, BOP expects that all inmates will have the opportunity to receive the vaccine.  *Id.*

BOP also continues to operate under modified conditions to reduce the spread of COVID-19 in its facilities.  All inmates and staff have been issued facial coverings to use, particularly when it is not possible to social distance.  *Correcting Myths and Misinformation About BOP and COVID-19*, BOP (May 6, 2020), https://www.bop.gov/coronavirus/docs/correcting_myths_and_misinformation_bop_covid19.pdf.  Common areas are sanitized multiple times per day.  *Id.* at 3.  Additionally, medical staff

screen every newly admitted inmate for COVID-19. *BOP Modified Operations*, BOP (Nov. 25, 2020), https://www.bop.gov/coronavirus/covid19_status.jsp. Inmates who are asymptomatic and test negative are placed in quarantine for 14 days. *Id.* Inmates who are symptomatic and/or test positive are placed in medical isolation. *Id.* Medical staff also conduct rounds and check inmate temperatures at least daily. *Correcting Myths and Misinformation About BOP and COVID-19*, at 1.

Inmate movements are "limited" to "prevent congregate gathering and maximize social distancing," with movement "in small numbers" permitted to access the commissary, laundry, showers, and phones. *BOP Modified Operations*. Movement is also still permitted for mental health and medical care. *Id.* Inmates who are transferring between facilities, moving to other correctional jurisdictions, or being released from BOP custody must quarantine for 14 days and test negative before transfer. *Id.* BOP will not transfer or release inmates with active COVID-19 "unless absolutely necessary." *Id.* For immediate releases where the inmate could not quarantine for 14 days, BOP provides a symptom screen, temperature check, and COVID-19 test on the day of departure and notifies the health authorities in the local jurisdiction if necessary. *Id.*

BOP also conducts temperature checks and COVID-19 screening for staff, contractors, and other visitors to its facilities. *Id.* Anyone who registers a temperature of 100.4 degrees Fahrenheit or higher cannot enter the building. *Id.* Staff who exhibit symptoms are sent home. *Correcting Myths and Misinformation About BOP and COVID-19*, at 3.

BOP previously suspended social visits but has since reinstated visits, directing each institution to adopt a visiting plan consistent with its resources, including space. *BOP Modified Operations*. Visits are "non-contact" and must be socially distant, either using

physical barriers such as plexiglass or physical distancing. *Id.* Inmates in quarantine or isolation cannot participate in visits. *Id.* Visitors must submit to symptom screening and a temperature check before entering a facility; those who are sick or symptomatic are denied entry. *Id.* Both the inmate and the visitor must wear facial coverings at all times and must perform hand hygiene before and after the visit. *Id.*

Additionally, BOP has expanded the use of home confinement during the COVID-19 pandemic, consistent with directives from the Attorney General. *See* Memorandum from Attorney General to BOP Director (Apr. 3, 2020), https://www.justice.gov/file/1266661/download; Memorandum from Attorney General to BOP Director (Mar. 26, 2020), https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf. BOP has been "reviewing all inmates who have COVID-19 risk factors, as described by the Centers for Disease Control and Prevention ("CDC"), to determine which inmates are suitable for home confinement." *COVID-19 Home Confinement Information*, BOP, https://www.bop.gov/coronavirus/ (last visited May 5, 2021). There are currently 7,276 inmates on home confinement, and the BOP has placed a total of 24,971 inmates in home confinement since March 26, 2020. *Id.*

## IV.     Conditions at the defendant's facility.

The defendant is currently serving his sentence at USP Hazelton a high security facility in Bruceton Mills, West Virginia.   https://www.bop.gov/mobile/find_inmate/ byname.jsp#inmate_results. He has served approximately 9 years of his life sentence.

USP Hazelton has a total of 1455 inmates. As of May 5, 1 inmate and 2 staff members at that facility are positive for COVID-19. Eighty-six inmates and 162 staff members previously tested positive for COVID-19 and have since recovered. Defendant received his first dose of the

Pfizer-BioNTech vaccine on April 6, 2021 and his second dose on April 27, 2021.[6]

**Argument**

**I.    Defendant's motion for compassionate release is not ripe for review because he has not satisfied the mandatory exhaustion requirement.**

The Court should dismiss defendant's motion for compassionate release as premature because defendant has failed to establish that he has exhausted his administrative remedies with BOP.  Under 18 U.S.C. § 3582(c)(1)(A), a defendant may file a motion for compassionate release in federal court only after he "has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on [his] behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  Because defendant failed to establish that he applied to the warden of his facility for compassionate release, he has not satisfied the statutory exhaustion requirement.  The Court should dismiss his motion without prejudice.

**A.    Section 3582(c)(1)(A) imposes a mandatory exhaustion requirement for compassionate release motions filed by defendants.**

Section 3582(c)(1)(A) provides two avenues by which a court may modify a term of imprisonment—a motion by the Director of BOP or a motion by a defendant.  When a defendant initiates the motion, the defendant must exhaust administrative review.  Section 3582(c)(1)(A) authorizes compassionate release "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of

---

[6] Defendant did not mention in his April 19, 2021 initial motion that he had begun the vaccine process nearly two weeks earlier.  He does not mention in is April 29, 2021 Supplemental Motion either that first shot or his second one, which occurred on April 27, 2021.

the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." The statute confirms that, following the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, "defendants now may bring reduction-of-sentence motions on their own once they exhaust any administrative remedies or wait 30 days from the date they request relief from the Bureau of Prisons." *United States v. Ruffin*, 978 F.3d 1000, 1004 (6th Cir. 2020). Before they do so, however, they "must at least ask [BOP] to do so on their behalf and give BOP thirty days to respond." *United States v. Raia*, 954 F.3d 594, 595 (3d Cir. 2020).

The statutory exhaustion requirement is a mandatory, non-jurisdictional claims-processing rule. *See United States v. Sanford*, 986 F.3d 779, 782 (7th Cir. 2021); *United States v. Franco*, 973 F.3d 465, 468 (5th Cir. 2020); *United States v. Springer*, 820 F. App'x 788, 791–92 (10th Cir. 2020); *United States v. Alam*, 960 F.3d 831, 833–34 (6th Cir. 2020); *Raia*, 954 F.3d at 597; *see also, e.g.*, *United States v. Beahm*, No. 1:05-CR-249, 2020 WL 4514590, at *1 (E.D. Va. Aug. 5, 2020). This requirement serves an important purpose: it "provide[s] BOP with the first opportunity to evaluate a prisoner's request," consistent with Congress's determination that "BOP, not the Court is better positioned to first evaluate a defendant's request and consider whether modification of a term of imprisonment is appropriate." *Beahm*, 2020 WL 4514590, at *1; *see also United States v. Link*, — F. App'x —, 2021 WL 1166408, at *2 (7th Cir. Mar. 29, 2021) ("The purpose of this requirement is to allow the Bureau an opportunity to evaluate issues before they are brought to federal court."). Further, requiring defendants to seek relief first with BOP "ensures that prison administrators can prioritize the most urgent claims" and "can investigate the gravity of the conditions supporting compassionate release and the likelihood that the conditions will persist." *Alam*, 960 F.3d at 835.

It follows that a defendant must present the same claims in support of compassionate release to BOP that he presents to the Court. *See, e.g.*, *United States v. Williams*, 987 F.3d 700, 703 (7th Cir. 2021); *Springer*, 820 F. App'x at 791; *United States v. Doyle*, No. 2:04-CR-20127-03, 2021 WL 929878, at *2 (W.D. La. Mar. 10, 2021); *United States v. Knight*, No. 1:15-CR-393, 2020 WL 4059886, at *2 (M.D.N.C. July 20, 2020) (collecting cases). Otherwise, "[a]llowing an inmate to present the Court with an entirely new basis for a sentence reduction denies [BOP] the opportunity to evaluate the request on its merits and undermines the mandatory statutory exhaustion requirement." *Knight*, No. 1:15-CR-393, 2020 WL 4059886, at *2. Evening assuming defendant did submit a request for compassionate release to his counselor, he has provided no copy, so it is not possible to determine if defendant has raised new bases for his present motion.

### B.    Defendant failed to exhaust his administrative remedies with BOP.

Defendant has not complied with the statutory exhaustion requirement because he has not established that he ever presented his request for compassionate release to the warden of his facility. BOP has no record of defendant filing a request for compassionate release. Section 3582(c)(1)(A) permits a defendant to exhaust his claim in one of two ways. The first avenue requires a defendant to submit a request to the warden and to "exhaust all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf." § 3582(c)(1)(A). The second way to satisfy the exhaustion requirement is by filing a motion in district court after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." § 3582(c)(1)(A).

In this case, the defendant has not satisfied the exhaustion requirement because he never applied to the warden of his facility for compassionate release.

### C.     The exhaustion requirement of § 3582(c)(1)(A) is mandatory and cannot be waived.

Section 3582(c)(1)(A) instructs that a "court may not modify" a sentence "except" "after the defendant has fully exhausted" all administrative appeals from BOP's failure to bring a motion "or the lapse of 30 days" from the warden's receipt of a request. Thus, the statutory text imposes a mandatory exhaustion requirement that permits no exceptions. *See, e.g.*, *Franco*, 973 F.3d at 468; *Alam*, 960 F.3d at 833–34; *Williams*, 829 F. App'x at 140. This interpretation is consistent with Supreme Court and Fourth Circuit precedent holding that mandatory, statutorily-imposed exhaustion requirements do not leave room for exceptions. *See, e.g.*, *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016) ("[M]andatory exhaustion statutes like the [Prison Litigation Reform Act] establish mandatory exhaustion regimes, foreclosing judicial discretion."); *see also Germain v. Shearin*, 725 F. App'x 225, 227 (4th Cir. 2018) ("Courts may not excuse an inmate's statutory duty to exhaust administrative remedies." (citing *Ross*, 136 S. Ct. at 1856–57)). That is because "'Congress sets the rules' when it comes to statutory exhaustion requirements," such that "the judiciary has a role to play in exception-crafting 'only if Congress wants [it] to.'" *Alam*, 960 F.3d at 834 (quoting *Ross*, 136 S. Ct. at 1857). Where, as here, the statutory text is clear, the Court must enforce the exhaustion requirement.

Defendant is serving a life sentence, leaving him sufficient time to move for compassionate release after exhausting his administrative remedies. *See Feiling*, 453 F. Supp. 3d at 839 (holding that exhaustion would not be futile where the defendant "started his seventy-month sentence in December 2019, which [left] him with ample time to move for compassionate release should the BOP deny his request or otherwise fail to act within the thirty-day period under § 3582(c)(1)(A)"); *see also Carr*, 2020 WL 2847633, at *4 (holding that the futility

doctrine was not available where the defendant's release date was "still more than six months away").

## II.    The Court should deny defendant's motion because he has not established an extraordinary and compelling reason for compassionate release.

Even if the Court determines that defendant has exhausted his administrative remedies, the Court should deny defendant's motion for compassionate release on the merits.  Defendant has not established that this Court should exercise its discretion under § 3582(c)(1)(A)(i) to grant compassionate.

Section 3582(c)(1)(A) authorizes a court to reduce a term of imprisonment when "extraordinary and compelling reasons warrant such a reduction."  Although the statute "does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release," the Sentencing Commission has "addressed the issue in a policy statement."  *United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020).  According to the policy statement, "extraordinary and compelling reasons" may exist based on the defendant's medical condition, age, family circumstances, or other reasons as determined by BOP.  U.S.S.G. § 1B1.13.  If a district court finds that extraordinary and compelling reasons exist, the court may not reduce a sentence before "considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent they are applicable."  § 3582(c)(1)(A).  A defendant bears the burden of proving that he is entitled to relief under § 3582(c)(1)(A).  *See United States v. Kannell*, 834 F. App'x 566, 567 (11th Cir. 2021) (per curiam); *see also United States v. Kenney*, No. 3:16-cr-143, 2021 WL 399724, at *1 (E.D. Va. Feb. 4, 2021); *United States v. Watson*, No. 1:07-cr-396, 2020 WL 7318269, at *1 (E.D. Va. Dec. 11, 2020).

The Fourth Circuit's recent decision in *McCoy* does not reduce the defendant's burden of establishing an "extraordinary and compelling" reason for relief under § 3582(c)(1)(A).  In

*McCoy*, the Court held that the policy statement in U.S.S.G. § 1B1.13 is not "applicable" to compassionate release motions brought by defendants under § 3582(c)(1)(A). 981 F.3d at 281–82. Because § 1B1.13 "was adopted before the First Step Act" and specifically mentions only motions brought by BOP, the Court reasoned that the policy statement does not apply to motions brought by defendants. *Id.* at 282. Absent an applicable policy statement, district courts should "make their own independent determinations of what constitutes an 'extraordinary and compelling reason[]' under § 3582(c)(1)(A), as consistent with the statutory language." *Id.* at 284. The Fourth Circuit noted, however, that § 1B1.13 "remains helpful guidance even when motions are filed by defendants." *Id.* at 282 n.7 (citing *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020) (observing that "[t]he substantive aspects of the Sentencing Commission's analysis in § 1B1.13 and its Application Notes provide a working definition of 'extraordinary and compelling reasons'" and that "a judge who strikes off on a different path risks an appellate holding that judicial discretion has been abused")). Accordingly, the Fourth Circuit has continued to reference § 1B1.13 as a guidepost for compassionate release motions even after *McCoy*. *See, e.g.*, *United States v. Trotman*, No. 20-6217, 2020 WL 7392287, at *2 (4th Cir. Dec. 17, 2020) (per curiam); *United States v. Adamson*, 831 F. App'x 82, 83 (4th Cir. 2020) (per curiam). Courts in this district have followed suit. *See, e.g.*, *United States v. Henry*, No. 3:15cr162, 2021 WL 682069, at *5 (E.D. Va. Feb. 22, 2021); *United States v. Smith*, No. 3:20cr14, 2021 WL 682067, at *3 (E.D. Va. Feb. 22, 2021); *United States v. Nabaya*, No. 3:17cr3, 2021 WL 54361, at *6 (E.D. Va. Jan. 6, 2021); *United States v. Reid*, No. 2:02cr172-7, 2020 WL 7318266, at *2 (E.D. Va. Dec. 10, 2020).

Courts have held that the COVID-19 pandemic, by itself, is not a sufficient basis for compassionate release. *See, e.g.*, *United States v. Thompson*, No. 20-40381, 2021 WL 37493, at

*3 (5th Cir. Jan. 5, 2021) ("Fear of COVID doesn't automatically entitle a prisoner to release.");

*Raia*, 954 F.3d at 597 ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release …."); *see United States v. Miller*, No. 3:16cr121, 2020 WL 4547809, at *5 (E.D. Va. Aug. 6, 2020) (Defendant "cannot rely merely on a fear of contracting COVID-19 as grounds for compassionate release." (internal quotation marks omitted)). "Indeed, a general fear of contracting COVID-19, without a sufficient basis for that fear, does not provide an extraordinary and compelling reason for a defendant's release." *United States v. Chandler*, No. 3:15mj122( (DJN), 2020 WL 6139945, at *5 (E.D. Va. Oct. 19, 2020). Instead, "[i]n the context of the COVID-19 outbreak, courts have found extraordinary and compelling reasons for compassionate release when an inmate shows both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility." *Adamson*, 831 F. App'x at 83 (quoting *Feiling*, 453 F. Supp. 3d at 841); *see United States v. Blevins*, No. 20-7053, 2020 WL 7691726, at *1 (4th Cir. Dec. 28, 2020) (per curiam).

### A. Defendant has not demonstrated that he faces a particularized susceptibility to COVID-19.

Defendant has not established an extraordinary and compelling reason for compassionate release because he has not shown that he faces a "particularized susceptibility" to COVID-19. *Adamson*, 831 F. App'x at 83. He asserts that his medical conditions place him at risk of developing severe symptoms if he contracts the coronavirus. Because he has already received both doses of the COVID-19 vaccine and there are few active cases of COVID-19 at his facility, he has not established that he is entitled to relief under § 3582(c)(1)(A).

Defendant asserts that he suffers from hypertension[7] and a hyperinflated lung.[8] According to the CDC, individuals with hypertension are more likely to suffer severe illness from COVID-19. *People with Certain Medical Conditions*, CDC (Mar. 29, 2021), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. While the CDC does not address hyperinflated lungs, it does include chronic lung diseases on the list of ailments that can make an individual more likely to suffer more serious effects from COVID-19. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

Interestingly, rather than spending his ink discussing the perils of hypertension and hyperinflated lungs, defendant magically morphs his ailments into heart disease. Brief of Defendant, ECF No. 94, at 9-10. Defendant's medical record does not suggest defendant suffers from any form of heart disease. Indeed, the same document upon which he relies for his claim of hyperinflated lungs reported that the test was "without radiographic evidence for an acute cardiopulmonary process." Defendant's Attachment A, p. 20.

His present ailments notwithstanding, defendant does not face a particularized susceptibility of contracting COVID-19 because he had been fully vaccinated from COVID-19. He received his first dose of the Pfizer-BioNTech vaccine on April 6, 2021. *See* Attachment A

---

[7] Defendant asserts that the BOP medical staff only took his blood pressure one time in 2020. Brief of Defendant at 8. He does not report any reason why the staff would have done so more frequently or why, unlike the general population outside prison, he would have had more than the standard yearly physical. Now that his present ailments have come to light, the staff takes his blood pressure more frequently. Thus, they took it on October 6, 2020, February 5, 2021 and April 8, 2021. Attachment A of the United States, p. 18. Each reading does indicate defendant has hypertension.

[8] This assertion is based on a single entry in his medical records, a report of an examination dated October 21, 2020. Defendant's Attachment A, p. 20.

of the United States, pp. 29, 35. He received his second dose on April 27, 2021. See Attachment B of the United States. The CDC represents that vaccination will protect individuals from getting sick with COVID-19 and will prevent individuals from "getting seriously ill" even if they do contract the virus. *Key Things to Know About COVID-19 Vaccines*, CDC (Apr. 13, 2021), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/keythingstoknow.html. Specifically, according to the CDC, the Pfizer-BioNTech vaccine is 95% effective at preventing illness from COVID-19. cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines/Pfizer-BioNTech.html#:~:text=Based%20on% 20evidence %20from%20clinical,works%20in%20real%2Dworld%20conditions.

The United States previously had acknowledged that an unvaccinated inmate with a condition identified by the CDC as likely to increase the risk of severe illness from COVID-19 has asserted an extraordinary and compelling reason for release because he is "suffering from a serious physical or medical condition … that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 n.1(A)(ii). But because this defendant had been fully vaccinated, "he simply does not show that he suffers from an extraordinary condition that is terminal or severely limits his ability to function in a correctional setting." *United States v. Burks*, No. 3:14-cr-208-MOC-1, 2021 WL 1394857, at \*4 (W.D.N.C. Apr. 13, 2021); *see United States v. Smith*, No. 17-cr-20753, 2021 WL 364636, at \*2 (E.D. Mich. Feb. 3, 2021), *appeal docketed*, No. 21-1209 (6th Cir. Mar. 2, 2021) ("[A]bsent some shift in the scientific consensus, Defendant's vaccination against COVID-19 precludes the argument that his susceptibility to the disease is 'extraordinary and compelling' for purposes of § 3582(c)(1)(A).").

Because vaccination mitigates the risk of contracting COVID-19, defendant cannot establish an "extraordinary and compelling" reason for compassionate release based on his concern about contracting the virus. *See, e.g.*, *United States v. Jones*, No. 3:19cr105, 2021 WL 217157, at *5 (E.D. Va. Jan. 21, 2021) (concluding, where the defendant had received his first dose of the vaccine and would receive his second dose "soon," that he "he face[d] reduced risks from the virus, [] weighing against his request for compassionate release"); *see also United States v. Baeza-Vargas*, No. CR-10-448-10-PHX-JAT, 2021 WL 1250349, at *3 (D. Ariz. Apr. 5, 2021) (collecting cases); *United States v. Williams*, No. 5:01-CR-12-KDB, 2021 WL 966028, at *3 (W.D.N.C. Mar. 15, 2021) (finding that the defendant "will not face a particularized susceptibility to COVID-19 because he will soon be fully vaccinated").

### B.    Defendant has not demonstrated that he faces a particularized risk of contracting COVID-19 at USP Hazelton.

Even if the Court determines that defendant suffers from a medical condition that makes him particularly susceptible to COVID-19, he has not established an "extraordinary and compelling" reason for compassionate release because he has not shown any "particularized risk of contracting the disease at his prison facility." *Adamson*, 831 F. App'x at 83; *see, e.g.*, *United States v. Evans*, No. 3:00cr63, 2020 WL 5121331, at *4-*5 (E.D. Va. Aug. 31, 2020) (finding that the defendant's underlying medical conditions were "extraordinary and compelling" but that she did not face a particularized risk of contracting COVID-19 at her facility).

Courts have required that a defendant's particularized risk "be supported by evidence of an actual outbreak in his facility, not simply the mere possibility of COVID-19 spreading to his camp." *United States v. Little*, No. 1:10-cr-135, 2020 WL 3442173, at *2 (E.D.Va. June 23, 2020); *see also, e.g.*, *Beahm*, 2020 WL 4514590, at *2. Based on defendant's hysterical view of the BOP world, once COVID-19 is introduced into a prison facility, it will spread unchecked like

wild-fire throughout the facility, infecting all in its path. Brief of Defendant at 12-15. Indeed, defendant asserts that "BOP cannot safeguard prisoners." Id. at 15. The facts do not support this apocalyptic claim.

Though BOP has been dealing with COVID-19 for over a year, as of May 5, 2021, only 1 out of a total 1455 inmates and only 2 staff members at USP Hazelton[9] are positive for COVID-19. *COVID-19 Cases*, BOP, https://www.bop.gov/coronavirus/ (last visited May 5, 2021). No inmates or staff have died from COVID-19 at USP Hazelton. The low number of active cases illustrates that BOP has done a tremendous job controlling the spread of COVID-19 and, as a result, defendant is not at a heightened risk of contracting COVID-19 at his facility. *See, e.g.*, *United States v. Woolridge*, No. 3:09cr156 (DJN), 2021 WL 415131, at *5 (E.D. Va. Feb. 5, 2021) (finding no particularized risk where there were only 8 active cases of COVID-19 among an inmate population of 1,404); *United States v. Wilkins*, No. 7:17-cr-407-JMC-1, 2021 WL 194311, at *3 (D.S.C. Jan. 20, 2021) (finding no particularized risk where there were only 10 active cases at the defendant's facility). Further, 86 inmates and 162 staff members at the facility previously tested positive for COVID-19 and have since recovered. *COVID-19 Cases*,

---

[9] In his motion, defendant provides COVID-19 data for FCI Hazelton. Brief of Defendant at 6. He is housed at USP Hazelton, however. *See*, e.g., Defendant's Attachment A, p. 20, upon which he relies to assert he has hyperinflated lungs. *See also* bop.gov/mobile/find_inmate /byname.jsp#inmate_results.

As of May 5, 2021, FCI Hazelton has zero inmates or staff who are positive for COVID-19, a drop of 4 inmates and 16 staff from defendant's report. Only 1 inmate and zero staff have succumbed to COVID-19. One hundred and forty-one inmates and seventy-seven staff have recovered from COVID-19 at FCI Hazelton. https://www.bop.gov/coronavirus.

USPs are typically for high-level custody inmates, though some are designated to house medium security inmates. FCIs are for medium and low security inmates. https://www.bop.gov/about/facilities/federal_prisons.jsp. USP Hazelton is a high security facility. https://www.bop.gov/mobile/find_inmate/byname.jsp#inmate_results

BOP, https://www.bop.gov/coronavirus/ (last visited May 5, 2021). These figures demonstrate that the number of COVID-19 cases at USP Hazelton has been declining, such that the situation "is improving, not deteriorating." *Day*, 474 F. Supp. 3d (finding no particularized risk where the number of positive cases had "steadily declined since Defendant filed his motion").

In addition to defendant's complete vaccination, distribution of the vaccine to others at his facility further minimizes his risk of contracting COVID-19. *See Woolridge*, 2021 WL 415131, at *5 ("[A]s the availability of the COVID-19 vaccine continues to increase in the coming months, especially for individuals in correctional facilities, the risk posed by COVID-19 will likely continue to decrease."). By mid-May, BOP expects that all inmates will have the opportunity to receive the vaccine. Becky Sullivan, *All Federal Inmates to Be Offered Vaccine by Mid-May, BOP Director Says*, NPR (Apr. 16, 2021), https://www.npr.org/2021/04/16/988237102/all-federal-inmates-to-be-offered-vaccine-by-mid-may-bop-director-says. .

Further, as defendant acknowledges, COVID-19 is a significant concern throughout the United States, not just in federal prisons. Brief of Defendant at 12 ("Since January 2020, COVID-19 has spread widely—and rapidly--throughout the United States"). Thus, as he apparently realizes, he would face significant potential exposure to COVID-19 even out of prison. According to the release plan defendant included in his Supplemental Motion, defendant will live with his daughter somewhere in Chesterfield, Virginia. But he does not show that his plan would make him safer than he presently is, where only 1 of 1455 inmates are currently positive for the virus *See United States v. Watson*, No. 1:07-cr-396, 2020 WL 7318269, at *2 (E.D. Va. Dec. 11, 2020) (finding that the defendant's release plan did not lower his risk of infection where "he would be living in a county with a significant number of positive COVID-19

cases"); *United States v. Lloyd*, No. 2:11cr36, 2020 WL 4501811, at *4 (E.D. Va. Aug. 5, 2020)

(denying compassionate release where the "Defendant's proposed release plan involve[d] living

with a family member just outside of Atlanta, Georgia, an area that has recently experienced a

surge in COVID-19 cases"); *United States v. White*, No. 3:18-CR-61 (HEH), 2020 WL 3442171,

at *6 (E.D. Va. June 23, 2020) (finding it was "not clear" that the defendant "would be safer

from the virus on home confinement" where "the number of cases in Richmond, Virginia—

where Defendant would be released on home confinement—far exceed[ed] the number of cases

in Petersburg, Virginia").

Chesterfield County has not been and is not immune from the pandemic. Indeed, the

place where defendant plans to go to be safe from COVID-19 has had 27,369 confirmed cases of

COVID-19, with, sadly, 424 of those infected dying as a result.

https://www.google.com/search?q=covid+cases+chesterfield%2C+va. Presently, the county is

experiencing a 7-day rate of 49 new COVID-19 cases per day. *Id.* And, there are presently 677

known COVID-19 cases in the County, which has a population of approximately 348,556. *Id.*;

https://datausa.io/profile/geo/chesterfield-county-va. That is actually a higher infection rate than

defendant faces at USP Hazelton. Further, while the BOP is committed to steps to prevent the

spread of the virus, the same cannot be said for the public at large. That is particularly troubling

as defendant, who claims a particular susceptibility to COVID-19, plans to clean houses if he is

released.[10] In other words, he will daily be going into strange houses where he will be exposed

to the risk of COVID-19 without the safeguards BOP has in place to protect him.

---

[10] That, of course, presupposes much. Should defendant be released to home detention
rather than home confinement, he would not be working outside the home.

Indeed, his release plan "would not necessarily be any safer for [defendant] because he would be released to a home that does not follow the strict procedures laid out in the BOP's modified operations plan." *Watson*, 2020 WL 7318269, at *2; *see Feiling*, 453 F. Supp. 3d at 842 ("[A]lthough Defendant argues that home confinement would allow him to better mitigate his exposure to COVID-19, the same can be said of keeping Defendant in prison, where the BOP has already taken steps to isolate prison facilities from internal and external sources of the coronavirus.").

Additionally, releasing defendant "might expose others to the dangers of COVID-19 because he would need to interact with his family, his probation officer, and other members of the community." *Id.* That would be particularly true if he were released to an environment that included a person who is at the same or a higher risk for severe illness from COVID-19. Defendant's release plan does not indicate whether that is the case here. And, releasing defendant to live with another "would presumably compound the risks" to the health of this other person by requiring that person "to go out into society and interact with others to obtain necessities." *Feiling*, 453 F. Supp. 3d at 842; *see also, e.g.*, *White*, 2020 WL 3442171, at *6 (observing that the defendant's release plan would impose risks on his "77-year-old mother, who [] offered to house him upon his release despite her own medical problems").]

## III.    The Court should deny the defendant's motion because the statutory sentencing factors do not support release.

Even if the Court determines that defendant has demonstrated an extraordinary and compelling reason for compassionate release, it should deny defendant's motion because the statutory sentencing factors weigh against release. Section 3582(c)(1)(A) requires a court to consider the factors set forth in 18 U.S.C. § 3553(a) before reducing a defendant's sentence. Those factors include "the nature and circumstances of the underlying offense and the history

and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), and "the need for the sentence imposed" "to reflect the seriousness of the offense, [] promote respect for the law, and [] provide just punishment for the offense," "to afford adequate deterrence to criminal conduct," and "to protect the public from further crimes of the defendant," *id.* § 3553(a)(2). Courts should also consider "the kinds of sentences available," *id.* § 3553(a)(3), and "the need to avoid unwarranted sentence disparities," *id.* § 3553(a)(6). Additionally, "the Sentencing Commission has emphasized that a defendant's rehabilitation while incarcerated," by itself, is "insufficient to warrant a sentence reduction." *Woolridge*, 2021 WL 415131, at *3 (citing U.S.S.G. § 1B1.13 n.3); *see* 28 U.S.C. § 994(t) ("Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason" for a sentence reduction.). In this case, the relevant statutory sentencing factors do not support compassionate release.

The seriousness of defendant's offense weighs heavily against release. Courts in this district consistently have denied compassionate release based on the seriousness of the defendant's offense. *Reid*, 2020 WL 7318266, at *3 (finding that the statutory sentencing factors weighed against release where the defendant had "served as a 'manager' in a vast drug-trafficking conspiracy" and "continued his wrongful conduct even after his arrest by directing a co-conspirator to collect drug proceeds"); *see also, e.g.*, *Prater*, 2021 WL 54364, at *6 (finding that a defendant convicted of drug and firearm-related offenses had "proved his willingness to deal drugs on a large scale and to use violence in furtherance of that drug-dealing activity"); *Albury v. United States*, No. 2:19-cr-68, 2020 WL 6779643, at *5 (E.D. Va. Oct. 23, 2020) (finding that the statutory sentencing factors weighed against release where the defendant "was convicted of a large-scale drug trafficking crime that he conducted over the course of five years," "possessed firearms," and "often travelled interstate to purchase and sell drugs").

Here, for approximately six years, until his arrest on murder charges, defendant was a leader in an extensive and extremely violent drug-trafficking organization. And his criminal conduct as part of the gang spanned approximately six years. It also included multiple acts of violence, including cold-blooded murder, to further the business of the gang that, in part, bears his name. And, though sentencing guidelines for many drug offenses have been reduced, several times, since defendant was initially sentenced, it was his violence that drove his range. That range has not changed. If sentenced today for the same crimes, defendant would continue to face a guideline range of life in prison.[11]

Defendant's criminal history underscores that the statutory sentencing factors do not support his request for release. Defendant had a criminal history category IV at the time of sentencing in this case, though he was only 22. While not the top criminal history category, it still bespeaks a committed criminal. And, in defendant's case, those crimes were significant and show an individual more criminally depraved than the typical individual in Criminal History Category IV. He has prior convictions for auto theft (age 17); assault (17); misdemeanor assault[12] (18); assault of a police officer[13] (18); interference with a police officer (19); receipt of

---

[11] As at the time of defendant's original sentencing, today defendant's guideline range for his Count Six conviction for violent crime in aid of racketeering would be governed by U.S.S.G. § 2E1.3. That provides a cross-reference "applicable to the underlying crime or racketeering activity." *Id*. at § 2E1.3(a)((2). In this case, the underlying crime was murder, so § 2A1.1(a) would apply. As it did at the time of defendant's sentencing, this section currently provides a base offense level of 43, which, alone would put defendant in a guideline range of life. However, this was not the only count of conviction. Thus, defendant would receive an additional 2-points for his multiple counts of conviction. *See* PSI, Worksheet B. With a criminal history category of IV and an adjusted offense level of 45, defendant would still face a guideline range of life.

[12] Defendant was initially charged with attempted murder and use of a firearm in the commission of a felony. ECF No. 72, p. 15, ¶ 80.

[13] Once again, defendant was initially charged with attempted murder and use of a firearm in

a firearm shipped in interstate commerce (21); and murder, use of a firearm in the commission a violent crime (three times), and attempted murder (twice) (22). In the last of these episodes, defendant and his confederates murdered a 16-year-old and attempted to murder two other individuals. From the charges, firearms were used in the murder and both attempts. ECF No. 72, pp. 17-18, ¶ 88. His record, then, reflects that he is an extremely violent and cold-blooded killer.

Compassionate release is not appropriate here because defendant presents a danger to the safety of others and the community. *See* 18 U.S.C. § 3142(g). Further, defendant "has more than one offense involving firearms, which raises concerns about public safety should he be released." *Harris*, 2020 WL 7646633, at *5; *see also, e.g.*, *Lloyd*, 2020 WL 4501811, at *4 ("Defendant was also attributed with a firearm at sentencing, a fact that further underscore[d] the seriousness of his criminal conduct.").

Defendant also asserts, with nothing but his self-serving claim to support it, that his able and experienced trial counsel unethically declined to convey to defendant a plea deal that would have resulted in a 30-year sentence. Brief of Defendant at 18. In addition to failing to offer any support for this claim or even a confirming statement from counsel, he neglects to explain how he now knows this and when he learned of it. More importantly, he does not assert that he would have accepted that offer had he known of it. There is no reason to believe he would have. Indeed, the PSI reports that even after his trial conviction he denied his guilt. "He said people associated Eugene Johnson with them and felt that they were closer than they really were. He advised that he feels that he was convicted because of name association." ECF No. 72, p. 13, ¶ 74. Even today, he minimizes his criminal conduct, referring to his gang as simply the

the course of an attempted murder. ECF No. 72, p. 15, ¶ 81.

"Johnson Gang," though it also carried his name when he was its top lieutenant.  He also dismisses his gross violent criminal conduct as the product of the influence of Johnson.[14]  Brief of Defendant at 24.  In fact, as his record reveals, defendant was a danger wholly apart from Eugene Johnson.[15]

But, even if defendant had accepted that plea deal, he has served but a fraction of the 30-year federal sentence he claims was offered to his counsel. The first 22 years after his trial, he was serving a state sentence for a murder that is not a part of the present federal case.  Defendant offers nothing to suggest that any plea offer was for concurrent time, in total or in part.

Defendant also asserts that compassionate release is appropriate based on his "self-reports" that he is "working to better himself while incarcerated."  Supplemental Motion of Defendant, ECF No. 100, p.3.  Although any steps toward self-improvement are commendable, courts in this district repeatedly have held that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason" for compassionate release.  *United States v. Hill*, No. 3:14cr114, 2020 WL 6049912, at *5 (E.D. Va. Oct. 13, 2020) (quoting 28 U.S.C. § 994(t)); *see Woolridge*, 2021 WL 415131, at *3.  Indeed, "rehabilitation is the *only* circumstance that Congress has singled out as *not* being 'extraordinary and compelling.'"  *United States v. Logan*, No. 97-CR-99(3) (PJS/RLE), 2021 WL 1221481, at *7 (D. Minn. Apr. 1, 2021). This limitation makes sense because defendants are expected to conduct themselves

_____

[14] Defendant asserts now, with no support, that "[w]ithout strong parental supervision or role modeling, Mr. Brown looked to Johnson for direction and Johnson led Mr. Brown down the wrong path."  Brief of Defendant at 21.  This is, indeed, rich with irony as defendant claimed shortly after his conviction that he actually was not that close to Johnson.  ECF No. 72, p. 13, ¶ 74.  Further, this blame-shifting is a complete abdication of responsibility for the extensive and extremely violent life defendant, by his own choice, led until his most recent incarceration.

[15] In addition to his criminal record, which is substantial and dangerous, defendant was expelled from Armstrong Kennedy High School for fighting.  ECF No. 72, p. 18, ¶ 93.

appropriately and try to better themselves while incarcerated. *See, e.g.*, *Logan*, 2021 WL 1221481, at *8 ("Prisoners are *supposed* to follow the rules, take classes, work at a job, and otherwise attempt to improve themselves. That a prisoner does so means that he has met baseline expectations, not that he has done something extraordinary."); *United States v. Martin*, No. 6:06-105-DCR, 2021 WL 134602, at *2 (E.D. Ky. Jan. 13, 2021) ("[G]ood behavior and education, which are expected of incarcerated individuals, do not constitute 'extraordinary and compelling circumstances' that warrant a sentence reduction."); *see also* Order at 6, *United States v. Ahmad*, No. 1:11-cr-554-TSE, ECF No. 75 (E.D. Va. Apr. 8, 2021) (finding that the defendant's coursework did not support compassionate release, reasoning that "[i]t is not uncommon for a defendant to take educational classes to pass the time in prison").

Consequently, defendant's efforts at rehabilitation do not outweigh the seriousness of his extensive and violent crimes in this case, his dangerous criminal history, and his continued danger to any community in which he might reside. *See, e.g.*, *Lloyd*, 2020 WL 4501811, at *4 n.7 ("While the Court commends Defendant for his documented efforts to work toward rehabilitation during his term of incarceration, his good behavior and pursuit of education in an institutional setting is insufficient to tip the scales in his favor based on the consideration of the record as a whole."); *Hill*, 2020 WL 6049912, at *5 ("While Hill's participation in an extensive number of educational and vocational programs [was] commendable," these measures did "not warrant his early release in light of the seriousness of his convictions and the time remaining on his sentence.").

Further, courts in this district have required a defendant to bear the burden of proving that his release plan will not pose a danger to the public. *See, e.g.*, *Miller*, 2020 WL 4547809, at *6 (finding that the defendant had "not done enough to establish that he [would] not be a danger to

society if released" based on his "criminal history, BOP records, and seeming inability to follow court orders, combined with the fact that his proposed release plan [did] not include any plan for ensuring that he [would] follow such orders and rules if granted release"); *Beahm*, 2020 WL 4514590, at *3 ("As the party seeking relief and with no statutory guidance otherwise, Defendant bears the burden to prove that he is entitled to compassionate release."). Defendant, however, offers no release plan.

In addition, defendant has not proposed a viable plan for his continued supervision if released. *See, e.g.*, *Turner v. United States*, No. 2:18-cr-128, 2020 WL 4370124, at *3 (E.D. Va. July 30, 2020) ("Under the circumstances, a generalized recitation of supervision conditions for sex offenders is no substitute for a release plan that proactively addresses the risk of a subsequent offense."); *Coleman v. United States*, 465 F. Supp. 3d 543, 550 (E.D. Va. 2020) (denying compassionate release where the court had no "confidence" that the defendant's "release plan [would be] conducive to appropriate conditions of supervision and would provide the community with adequate protection against the potential for a subsequent offense.").

Because the § 3553(a) factors counsel against relief, defendant is not entitled to compassionate release.

**Conclusion**

The Court should deny defendant's motion for compassionate release. In the alternative, if the Court determines that defendant is entitled to relief, the Court should require defendant to complete a 14-day quarantine controlled by BOP prior to his release.

Respectfully submitted,

Raj Parekh
Acting United States Attorney

By: _____/s/_____.
Stephen W. Miller
Assistant United States Attorney
Eastern District of Virginia
United States Attorney's Office
Suite 1900
919 East Main Street
Richmond, Virginia 23219
Tel.: (804) 819-5487; Fax: (804) 771-2316
Stephen.Miller@usdoj.gov

**Certificate of Service**

I certify that on May 5, 2021, I electronically filed the foregoing response with the Clerk

of Court using the CM/ECF system, which will serve all counsel of record.


By:      /s/ _____

                   Stephen W. Miller